*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ALANA GEORGIENNE GONZALEZ,

        Defendant-Appellant.

UNPUBLISHED
January 18, 2024

No. 360589
Berrien Circuit Court
LC No. 2020-001099-FC

Before: M. J. KELLY, P.J., and MARKEY and CAMERON, JJ.

PER CURIAM.

Defendant appeals by right her jury trial conviction of soliciting another person to commit murder. MCL 750.157b(2). The trial court sentenced defendant to 10 to 40 years' imprisonment. We affirm.

## I. BACKGROUND FACTS AND PROCEDURAL HISTORY

This case arose after defendant discovered her ex-husband, Elvin Gonzalez, was dating another woman. Defendant became enraged, and she sought a hitman to murder Elvin's girlfriend. She met Corey Parker at a liquor store and Parker later introduced her to Quacy Roberts. Defendant and Roberts exchanged many text messages over several months relating to defendant's plan to have Roberts murder the victim. Defendant also gave Roberts a written "agreement" stating that she would pay "1k down" and pay "5k if before 2/12/20" or "7k if before 2/1/20." She wrote that he should do the "Hit" at about 6:15 a.m. or 7:00 p.m. Defendant paid Roberts more than $1,000.

Roberts eventually reported the scheme to the Benton Township Police Department. A Berrien Circuit Court judge authorized a search warrant of defendant's home, where police officers seized a cell phone containing the text messages exchanged between defendant and Roberts. Defendant was arrested and charged with soliciting murder.

Because Elvin worked for the Berrien County courts, the judges there disqualified themselves, and the case was assigned to a visiting judge. The jury found defendant guilty and she was sentenced as noted. Defendant moved for a new trial, claiming that trial counsel was

-1-

ineffective for failing to move to suppress the text messages and for failing to impeach two prosecution witnesses. The trial court entertained oral argument, but ultimately denied the motion. Thereafter, defendant filed this claim of appeal. She moved this Court for a remand to conduct an evidentiary hearing concerning whether trial counsel was ineffective, which we rejected. *People v Gonzalez*, unpublished order of the Court of Appeals, entered April 17, 2023 (Docket No. 360589).

## II. VALIDITY OF THE SEARCH WARRANT

Defendant first argues that the search warrant used to seize her cell phone was invalid and therefore the text messages found on that phone should have been suppressed. We disagree.

### A. PRESERVATION AND STANDARD OF REVIEW

To preserve an issue for appellate review, defendant had to object in the trial court and specify the same ground for objection that she asserts on appeal. *People v Clark*, 330 Mich App 392, 414; 948 NW2d 604 (2019). Defendant concedes that she did not move to suppress the text messages because, in her view, the text messages were recovered under the authority of an invalid search warrant. Therefore, this claim of error is not preserved. *Id*.

"A trial court's findings of fact on a motion to suppress are reviewed for clear error, while the ultimate decision on the motion is reviewed de novo." *People v Hrlic*, 277 Mich App 260, 262-263; 744 NW2d 221 (2007). "Clear error exists when the reviewing court is left with a definite and firm conviction that a mistake was made." *People v Blevins*, 314 Mich App 339, 348-349; 886 NW2d 456 (2016). However, unpreserved claims of error are reviewed for plain error. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Id*. An error affects substantial rights when it "affected the outcome of the lower court proceedings." *Id*.

### B. LAW AND ANALYSIS

"The warrant traditionally has represented an independent assurance that a search and arrest will not proceed without probable cause to believe that a crime has been committed and that the person or place named in the warrant is involved in the crime." *Shadwick v City of Tampa*, 407 US 345, 350; 92 S Ct 2119; 32 L Ed 2d 783 (1972). Accordingly, a judicial officer who issues a warrant must satisfy two tests. First, "[h]e must be neutral and detached . . . ." *Id*. And second, "he must be capable of determining whether probable cause exists for the requested arrest or search." *Id*. In this case, the judge who issued the search warrant of defendant's home was familiar with Elvin because they worked in the same circuit court. Defendant argues that this judge impliedly conceded that he was biased against defendant when he (1) admitted to being familiar with defendant and Elvin and (2) disqualified himself from the case after conducting defendant's arraignment.

"A defendant claiming judicial bias must overcome a heavy presumption of judicial impartiality." *People v Jackson*, 292 Mich App 583, 598; 808 NW2d 541 (2011) (quotation marks and citation omitted). Our Supreme Court has held that a judge is disqualified when he or she cannot hear a case impartially, which normally requires proof of actual bias. See *Cain v Dep't of*

*Corrections*, 451 Mich 470, 494-497; 548 NW2d 210 (1996). However, "[c]ertain situations have been identified as requiring dismissal when the appearance of impropriety is too great even though no actual prejudice is shown." *People v Payne*, 424 Mich 475, 478 n 3; 381 NW2d 391 (1985), quoting *People v Lowenstein*, 118 Mich App 475, 483; 325 NW2d 462 (1982). Those cases are rare and they arise when the "risk of actual bias is too prevalent, so that the constitutional guarantee . . . would be inhibited." *Cain*, 451 Mich at 514. Such a case exists when there is a serious risk of actual bias premised on objective and reasonable perceptions. See MCR 2.003(C)(1); *Caperton v AT Massey Coal Co, Inc*, 556 US 868, 884; 129 S Ct 2252; 173 L Ed 2d 1208 (2009). Mere acquaintance with a party is not normally sufficient to warrant disqualification. See, e.g., *Reno v Gale*, 165 Mich App 86, 90; 418 NW2d 434 (1987) ("Although we recognize that in certain instances disqualification is necessary, we find no legal or ethical basis for such an action simply because a trial judge is acquainted with a party as a local practitioner.")

At defendant's arraignment, the judge noted that he had signed the search warrant for the case and was "somewhat familiar that one of the parties involved is a court administrator." The judge relayed that he planned to disqualify himself because he thought that "it could create an appearance of impropriety." The judge clarified that he knew defendant's "former husband" but that he had "never been to their house." He also stated that he had met defendant "in passing."

The record does not demonstrate that the judge had a relationship with anyone involved in this case that would justify disqualification. There is no evidence of actual bias arising from the judge's relationship with Elvin or defendant. See *Cain*, 451 Mich at 494-497. Moreover, a mere acquaintanceship with another person—even a coworker—does not constitute the kind of relationship for which there is a serious risk of actual bias premised on objective and reasonable perceptions. See *Caperton*, 556 US at 884. The judge's statements showed that he was minimally acquainted with Elvin, but that did not establish that the judge could not act as a neutral and detached magistrate for purposes of making a probable-cause determination. See *Reno*, 165 Mich App at 90. Accordingly, there is nothing in the record supporting defendant's argument that the judge who signed the search warrant was per se unqualified or disqualified from acting as a neutral and detached magistrate. Defendant has not shown that the trial court plainly erred when it failed to sua sponte suppress the fruit of the search because she has not shown the search warrant was signed by a person who was not qualified to act as a neutral and detached magistrate. See *Carines*, 460 Mich at 763.

## III. INEFFECTIVE ASSISTANCE

Defendant next argues various reasons she was denied effective assistance of counsel. None of these arguments warrants relief.

## A. STANDARD OF REVIEW

Defendant's ineffective assistance of counsel claim "is a mixed question of fact and constitutional law." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). The trial court's conclusions of law are reviewed de novo and its findings of fact are reviewed for clear error. *People v Shaw*, 315 Mich App 668, 671-672; 892 NW2d 15 (2016). Because there was no evidentiary hearing to expand the record, this Court's review of defendant's ineffective assistance claim is limited to mistakes apparent on the record. See *Clark*, 330 Mich App at 425-426.

## B. LAW AND ANALYSIS

To establish a claim of ineffective assistance of counsel that warrants a new trial, defendant must show that trial counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and that, but for trial counsel's deficient performance, there is a reasonable probability that the outcome of her trial would have been different. *People v Haynes*, 338 Mich App 392, 429; 980 NW2d 66 (2021). This Court strongly presumes that trial counsel acted within the wide range of reasonable professional conduct. *Id*. Indeed, "[i]f this Court can conceive of a legitimate strategic reason for trial counsel's act or omission, this Court cannot conclude that the act or omission fell below an objective standard of reasonableness." *Id*. at 429-430. "This Court will not substitute its judgment for that of counsel on matters of trial strategy, nor will we use the benefit of hindsight when assessing counsel's competence." *People v Loew*, 340 Mich App 100, 120; 985 NW2d 255 (2022) (quotation marks, alteration, and citation omitted).

## 1. JUDICIAL BIAS

Defendant first argues trial counsel was ineffective for failing to move to suppress the text messages found on her phone because a neutral and detached magistrate did not issue the search warrant. As discussed above, defendant has failed to demonstrate judicial bias. Therefore, trial counsel cannot be faulted for failing to move to suppress the text messages on the basis of judicial bias. *People v Riley*, 468 Mich 135, 142; 659 NW2d 611 (2003) ("Ineffective assistance of counsel cannot be predicated on the failure to make a frivolous or meritless motion.").

## 2. IMPEACHMENT

Defendant next asserts that trial counsel was ineffective for failing to adequately impeach Roberts's and Parker's testimonies regarding their respective criminal histories. By failing to properly challenge these witnesses with their criminal records, trial counsel's performance fell below an objective standard of reasonableness under prevailing professional norms.

With respect to Roberts, defendant claims that Roberts had been convicted of harboring escapees, larceny in a building, using 911 for an unauthorized purpose, and for filing false reports. Defendant maintains that, had trial counsel raised Roberts's criminal history at trial, the jury surely would not have believed him and, for that reason, would have found her not guilty. This argument is not persuasive.

Even assuming defendant has accurately identified Roberts's criminal history and that trial counsel could have impeached Roberts with these convictions under MRE 609, defendant has not shown that trial counsel's decision not to raise this issue fell below an objective standard of reasonableness under prevailing professional norms, or that her actual strategy for impeachment was unreasonable. See *People v McFarlane*, 325 Mich App 507, 527; 926 NW2d 339 (2018). Whether a witness is called and how they are examined is a matter of trial strategy, which this Court will not second guess with the benefit of hindsight. *People v Dixon*, 263 Mich App 393, 398; 688 NW2d 308 (2004).

Despite defendant's argument to the contrary, the record shows that trial counsel elected to pursue a reasonable strategy for impeaching Roberts. Indeed, defendant admits on appeal that

trial counsel did in fact present evidence that Roberts had been convicted of larceny in a building. Roberts also testified about a case that sent him to jail in February 2020. He stated that he had an "anxiety attack," went to the hospital to get "some medication," and they "locked [him] up for trying to get [his] medication." Although trial counsel in this case did not specifically inform the jury that Roberts had been convicted of false report of a medical emergency in February 2020, she did not need to because the jury could have easily inferred from Roberts's testimony that he had lied to obtain medication. The jury was also clearly aware that Roberts had himself engaged in criminal acts by taking money from defendant under the pretext of a murder for hire agreement— even if he had no intention of carrying out the agreement—and that he continued to use the scheme to exploit defendant for money, and that he had even attempted to get sexual favors from her. Furthermore, he testified that he had "fun every day" with the money that he got from defendant. Trial counsel's cross-examination of Roberts demonstrated to the jury that Roberts was not beneath using lies and manipulation to get what he wanted.

Trial counsel also impeached Roberts with numerous inconsistencies in his statements, and demonstrated that Roberts's memory was not particularly trustworthy, and that he had a motive to implicate defendant in a more serious crime. Roberts agreed, for example, that he went to the police with his allegations to gain an advantage over defendant regarding the investigation and prosecution in this case. Trial counsel also got Roberts to repeatedly remind the jury that the police officers who investigated this case did not find him credible. Roberts informed the jury that the police officers and prosecutor never believed him despite his efforts. As Roberts himself aptly told the jury: "Don't nobody believe me nowhere, so it really don't make a difference." There can be no doubt, given this record, that trial counsel—through her vigorous cross-examination of Roberts—established in the jurors' minds that Roberts was an unsavory person with serious credibility issues.

On the basis of this record, trial counsel could have reasonably concluded that it would not be helpful to further impeach Roberts with yet more examples of his "unconventional lifestyle"— as the trial court described it. The additional convictions, at best, established still more examples of Roberts's willingness to defraud. They were not, however, particularly noteworthy offenses, and the diminishing return on the investment in further impeachment might not have justified the effort. Trial counsel could have believed that emphasizing Roberts's convictions might have distracted the jury from her chosen closing argument: namely, that the investigating officers did not seriously investigate Roberts's allegations, which would ordinarily warrant a quick and decisive response, because they did not find his allegations worthy of belief.

Trial counsel was also in a better position to judge the composition of the jury and determine which arguments and what emphases were more likely to persuade the individual jurors. They might additionally have concluded that parading convictions before the jury, especially minor convictions involving fraud, would only have served to emphasize that Roberts was, as he himself told the jury, a thief, not a killer; that in turn might have undermined defendant's credibility on the critical issue whether Roberts was the first to suggest the use of violence. Because this Court can conceive of legitimate strategic reasons for trial counsel's decision to proceed as she did, we cannot conclude that trial counsel's failure to follow defendant's preferred line of impeachment fell below an objective standard of reasonableness under prevailing professional norms. See *Haynes*, 338 Mich App at 429-430.

The same is true for defendant's argument about Parker's testimony. She argues on appeal trial counsel was ineffective for failing to impeach Parker with his conviction of misdemeanor welfare fraud. The jury heard that defendant believed Parker to be homeless when she spoke to him at the liquor store and purportedly took his advice on how to make money. Parker admitted that he was in a "situation" at the time and was hanging out at a liquor store and a gas station because the government had taken away his supplemental social security income after he got out of prison. The jury heard that Parker gave Roberts's phone number to defendant in exchange for alcohol. Trial counsel also elicited testimony from Parker on cross-examination that strongly suggested that Parker was a poor historian of events.

Trial counsel could reasonably conclude that presenting evidence that Parker had a misdemeanor conviction involving welfare would be distracting and unhelpful for the same reasons involving Roberts. This is especially true given that Parker admitted that he had been imprisoned, implied that he was begging at a liquor store because he had lost his welfare benefits, and was willing to provide the contact information for a person who would commit murder for hire in exchange for a bottle of liquor. It is also noteworthy that, despite Parker's shortcomings, defendant testified that his testimony was almost entirely accurate; her only disagreement with his testimony was over his claim that she approached him and stated that she wanted to have someone killed. On this record, trial counsel could reasonably forgo further impeaching Parker with a misdemeanor conviction that added very little to the already comprehensive examination of his credibility. Consequently, that decision cannot be said to have fallen below an objective standard of reasonableness. *Haynes*, 338 Mich App at 429. Because defendant failed to show deficits in counsel's performance, we need not consider whether defendant was prejudiced by trial counsel's actions. See *id*.

## 3. JURY INSTRUCTIONS

Defendant next contends that trial counsel was ineffective for not requesting the jury instructions on accomplice testimony. She maintains that, had the jury been instructed to weigh Roberts's credibility more carefully consistent with the instructions, the jury would likely have found her not guilty.

"A criminal defendant has the right to have a properly instructed jury consider the evidence against him." *People v Ogilvie*, 341 Mich App 28, 34; 989 NW2d 250 (2022), quoting *People v Mills*, 450 Mich 61, 80; 537 NW2d 909 (1995). A trial court, however, is not required to sua sponte instruct the jury on accomplice testimony; trial counsel had an obligation to request the instruction. See *Ogilvie*, 341 Mich App at 35. Even with a request, the trial court has no obligation to give the instruction if the instruction was not supported by the evidence. *Id*.

With respect to the witness testimony in this case, the trial court instructed the jury consistent with M Crim JI 3.6 as follows:

> So as I told you before . . . it is your job to decide what the facts of the case are, and you must decide which witnesses you believe and how important you think their testimony is. You do not have to accept or reject everything a witness says. You are free to believe all, none, or any part of any witness' [sic] testimony.

In deciding which testimony you believe, you should rely on you own common sense and everyday experiences. However, in deciding whether you believe a witness' [sic] testimony, you must set aside any bias or prejudice you may have based on the race, gender, or national origin of the witness.

There are no fixed set of rules for judging whether you believe a witness, but it may help you to think about these questions: Was the witness able to see or hear clearly? How long was the witness watching or listening? Was anything else going on in the area that might have distracted the witness? Did the witness seem to have a good memory?

How did the witness look and act while testifying? Did the witness seem to be making an honest effort to tell the truth, or did the witness seem to evade the questions or argue with the lawyers? Does the witness's age or maturity affect how you judge his or her testimony? Does the witness have any bias, prejudice, or personal interest in how this case is decided?

Have there been any promises, threats, suggestions, or other influences that . . . affected how the witness testified? In general, does the witness have any special reason to tell the truth, or any special reason to lie? All in all, how reasonable does the witness's testimony seem when you think about all the other evidence in the case?

Sometimes the testimony of different witnesses will not agree and you must decide which testimony you accept. You should think about whether the disagreement involves something important or not, and whether you think someone is lying or is simply mistaken. People see and hear things differently and witnesses may testify honestly but simply be wrong about what they thought they saw or remembered. It is also a good idea to think about which testimony agrees best with the evidence in this case.

However, you may conclude that a witness deliberately lied about something that is important to how you decide this case. If so, you may choose not to accept anything that witness said. On the other hand, if you think the witness lied about some things but told the truth about others, you may simply accept the part that you think is true and ignore the rest.

Regarding Roberts's testimony specifically, the trial court instructed the jury as follows:

You have heard that one witness, Quacy Roberts, had been convicted of a crime in the past. You should judge this witness' [sic] testimony the same way you judge the testimony of other witnesses. You may consider his past criminal convictions along with all the other evidence when you decide whether you believe his testimony and how important you think it is.

Defendant argues trial counsel should have also requested an accomplice instruction to further challenge Roberts's testimony. At issue is M Crim JI 5.6, the purpose of which is to "raise

-7-

the jury's awareness of the potential ulterior motives of the witness." *People v Lockett*, 295 Mich App 165, 186; 814 NW2d 295 (2012). This model instruction states:

> (1) You should examine an accomplice's testimony closely and be very careful about accepting it.

> (2) You may think about whether the accomplice's testimony is supported by other evidence, because then it may be more reliable. However, there is nothing wrong with the prosecutor's using an accomplice as a witness. You may convict the defendant based only on an accomplice's testimony if you believe the testimony and it proves the defendant's guilt beyond a reasonable doubt.

> (3) When you decide whether you believe an accomplice, consider the following:

> (a) Was the accomplice's testimony falsely slanted to make the defendant seem guilty because of the accomplice's own interests, biases, or for some other reason?

> (b) Has the accomplice been offered a reward or been promised anything that might lead [him / her] to give false testimony? [State what the evidence has shown. Enumerate or define reward.]

> (c) Has the accomplice been promised that [he / she] will not be prosecuted, or promised a lighter sentence or allowed to plead guilty to a less serious charge? If so, could this have influenced [his / her] testimony?

> [(d) Does the accomplice have a criminal record?]

> (4) In general, you should consider an accomplice's testimony more cautiously than you would that of an ordinary witness. You should be sure you have examined it closely before you base a conviction on it. [M Crim JI 5.6.]

In this case, even if Roberts qualified as an accomplice, see *People v McGhee*, 268 Mich App 600, 608-609; 709 NW2d 595 (2005), there was no reason trial counsel should have sought the accomplice instruction. According to defendant, "the jury should have been instructed to exercise caution when considering [Roberts's] testimony." But, the trial court's instructions specifically explained that jurors should examine the credibility of each witness. Moreover, trial counsel established through her cross-examination that Roberts had an ulterior motive to overstate defendant's culpability. Counsel also raised that issue in her closing statement.

Trial counsel may reasonably have concluded that requesting an accomplice instruction would needlessly focus the jury on Roberts's status as an accomplice in a murder-for-hire scheme. Instead of emphasizing Roberts's status as an accomplice, trial counsel may have felt that it was better to rely on the ordinary witness instruction and direct the jury's attention to Roberts's motive to tell police officers what they wanted to hear and argue that the police officers did not find Roberts credible. Because this Court can conceive of a legitimate strategic reason for trial

counsel's decision to refrain from requesting the instruction, it necessarily does not fall below an objective standard of reasonableness under prevailing professional norms. See *Haynes*, 338 Mich App at 429-430.

## 4. CUMULATIVE ERROR

Defendant further contends that, even if no one act or omission amounted to ineffective assistance of counsel warranting relief, the cumulative effect of the acts or omissions that fell below an objective standard of reasonableness nevertheless warrant relief.

The cumulative error doctrine is part of a reviewing court's harmless-error analysis. See *LeBlanc*, 465 Mich at 591 n 12. The doctrine recognizes that the cumulative effect of several minor errors may warrant a new trial even though no one error warranted a new trial on its own. See *People v Cooper*, 236 Mich App 643, 659-660; 601 NW2d 409 (1999). In assessing whether multiple errors undermined confidence in the trial, reviewing courts must examine only the unfair prejudice caused by *actual* errors. See *LeBlanc*, 465 Mich at 591 n 12. Defendant has not established that trial counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, or that trial counsel actually erred. Accordingly, reversal of defendant's conviction on the basis of cumulative error is not warranted. See *id*.

## IV. SENTENCING FACTORS

Defendant next argues that the trial court improperly considered her refusal to admit guilt or her decision to proceed to trial when crafting her sentence. She also claims the sentence imposed was disproportionate. We disagree.

## A. PRESERVATION AND STANDARD OF REVIEW

This Court reviews de novo whether the trial court deprived a defendant of his or her due-process rights. See *People v Horton*, 341 Mich App 397, 401; 989 NW2d 885 (2022). Because she did not preserve this claim of error, this Court's review is limited to determining whether there was plain, outcome-determinative error. See *Carines*, 460 Mich at 763.

Further, "defendants may challenge the proportionality of any sentence on appeal and that the sentence is to be reviewed for reasonableness." *People v Posey*, ___ Mich ___, ___; ___ NW2d ___ (2023) (Docket No. 345491); slip op at 37. "Sentencing decisions are reviewed for an abuse of discretion . . . ." *Id*. at ___; slip op at 4. A trial court abuses its discretion if the sentence is not "proportionate to the seriousness of the circumstances surrounding the offense and the offender." *People v Steanhouse*, 500 Mich 453, 459-460; 902 NW2d 327 (2017).

## B. LAW AND ANALYSIS

A trial court may not base its sentence "even in part on a defendant's refusal to admit guilt." *People v Dobek*, 274 Mich App 58, 104; 732 NW2d 546 (2007). The court may, however, consider the defendant's lack of remorse because a lack of remorse implicates the defendant's potential for rehabilitation. *Id*. It is also a violation of due process to punish a person for asserting his or her constitutional right to a trial. See *People v Pennington*, 323 Mich App 452, 467; 917 NW2d 720 (2018). When analyzing whether a trial court improperly considered the defendant's refusal to

-9-

admit guilt, this Court reviews three factors: "(1) the defendant's maintenance of innocence after conviction; (2) the judge's attempt to get the defendant to admit guilt; and (3) the appearance that had the defendant affirmatively admitted guilt, his sentence would not have been so severe." *Dobek*, 274 Mich App at 104 (quotation marks and citation omitted). "If there is an indication of the three factors, then the sentence was likely to have been improperly influenced by the defendant's persistence in his innocence." *Id*. (quotation marks, alteration, and citation omitted).

At sentencing, the trial court focused on evidence that defendant did not recognize the gravity of her behavior. The court opined that defendant still did not understand that the jury had convicted her of hiring someone to commit murder. The court further felt that defendant did not understand that she was not the victim—she was the perpetrator who victimized numerous other persons through her actions. It stated that many people go through difficult experiences such as divorce without trying to hurt or kill someone. The court recognized that defendant—in her own mind—did not think that she had done anything wrong, but it reiterated that the jury found that defendant was in fact trying to hire someone to kill the victim. The trial court then concluded it was unlikely for defendant to show improvement unless she admitted her guilt:

> I realize your testimony was oh, no, I just wanted to scare her. That's ridiculous in and of itself. That's pure evil in and of itself, and until you can get a hold of yourself, until you can admit what you did was wrong—and you have wreaked chaos for years in this entire courtroom, your family, their family, everybody.

The trial court reminded defendant that, had she taken the opportunity to admit her actions and therefore limit the victim's pain, she would have received a reduced sentence, but defendant refused that offer. It noted that defendant chose to continue with the trial and had continued her dispute even after having been found guilty. She had no remorse and asserted that no one was hurt, which the court felt was obviously wrong. The court stated that it hoped that defendant had in fact begun therapy because it felt that, only with treatment, would defendant be able to admit what she had done and "heal as a person." After these remarks, the trial court examined the specific factors that it should consider when crafting a sentence and closed by stating that defendant's failure to admit that she was not a victim implicated the need to protect society from her.

While the statements referenced defendant's refusal to admit guilt, it does not appear the trial court punished defendant more severely because she maintained her innocence. Instead, these statements appropriately suggest that the trial court was concerned that defendant's lack of remorse and her inability to see that what she had done was wrong implicated her rehabilitative potential. *Dobek*, 274 Mich App at 104. We discern no plain error where it appears the trial court fashioned defendant's sentence on the basis of her possibility for rehabilitation.[1]

---

[1] We note that the prosecution concedes that the trial court's statements might have amounted to error. But, given our review is for plain error, any error must be apparent from the face of the record. In this instance, there is no such error warranting our reversal. See *People v Perry*, 317

Defendant also argues on appeal that her within-guidelines sentence was disproportionate. A sentence within the recommended range is presumptively proportionate, and defendant bears the burden to establish that the sentence was not proportionate given the nature of her offense and her status as an offender. See *Posey*, ___ Mich at ___; slip op at 36; see also *Graham v Florida*, 560 US 48, 59; 130 S Ct 2011; 176 L Ed 2d 825 (2010). A trial court may consider several factors relating to the proportionality of a sentence. These include:

> (1) the seriousness of the offense; (2) factors that were inadequately considered by the guidelines; and (3) factors not considered by the guidelines, such as the relationship between the victim and the aggressor, the defendant's misconduct while in custody, the defendant's expressions of remorse, and the defendant's potential for rehabilitation. [*People v Lampe*, 327 Mich App 104, 126; 933 NW2d 314 (2019) (quotation marks and citation omitted).]

In this case the recommended range under the sentencing guidelines was 81 to 135 months' imprisonment. The trial court's sentence—10 to 40 years' imprisonment—was within this range. According to defendant, this within-guidelines sentence was nevertheless disproportionate because she had no prior criminal convictions, behaved well while on bond, and she did not physically harm anyone. A defendant challenging a within-guidelines sentence may overcome the presumption of proportionality by "present[ing] unusual circumstances that would render the presumptively proportionate sentence disproportionate." *People v Bowling*, 299 Mich App 552, 558; 830 NW2d 800 (2013) (quotation marks and citation omitted). "Unusual" is defined as "uncommon, not usual, rare." *People v Sharp*, 192 Mich App 501, 505; 481 NW2d 773 (1992) (quotation marks, brackets, and citation omitted). Defendant's arguments challenging the proportionality of the sentence do not demonstrate "unusual" circumstance warranting our reversal. Indeed, all these factors were addressed by the sentencing guidelines.

Defendant asserts on appeal that she was remorseful, but the record demonstrates otherwise. Defendant told the trial court that she was "sorry [the victim] has had to deal with this." Immediately after making this lukewarm expression of remorse, however, defendant launched into a discussion about how the proceedings had and would adversely affect *her*. The context showed—as the trial court aptly noted—that defendant still thought of herself as the real victim. Defendant's inability to accept that her actions harmed the victim strongly implicates her rehabilitative potential. Consequently, defendant's complete lack of remorse was a significant factor in favor of a higher minimum sentence notwithstanding her age, health, and ability to procure letters of recommendation. See *People v Lemons*, 454 Mich 234, 259-260; 562 NW2d 447 (1997) (holding that the sentences were proportionate because the defendants laughed at one victim during trial, rejected plea agreements that would have spared the victims the horror of reliving the events at trial, and "expressed no remorse whatsoever for the obvious pain and suffering" that they inflicted).

Mich App 589, 601; 895 NW2d 216 (2016) (stating this Court is not bound by a prosecutor's concession).

-11-

## V. STANDARD 4 BRIEF

Defendant additionally raises a bevy of issues in a brief submitted pursuant to Michigan Supreme Court Administrative Order 2004-6 (the "Standard 4 Brief"). None of the issues raised in defendant's Standard 4 Brief warrant relief.

## A. PROSECUTORIAL ERROR[2]

Defendant argues that the prosecutor committed various acts or omissions that she opines were improper and violated her right to due process of law. We disagree.

### 1. PRESERVATION AND STANDARD OF REVIEW

This Court reviews de novo, as a matter of constitutional law, whether a prosecutor's acts or omissions deprived the defendant of a fair trial. *People v Aceval*, 282 Mich App 379, 389; 764 NW2d 285 (2009). Because these claims of error are not preserved, our review is limited to determining whether the errors were plain or obvious and affected the outcome of the lower court proceedings. See *Carines*, 460 Mich at 763.

### 2. LAW AND ANALYSIS

A prosecutor can cause error that warrants a new trial, *Aceval*, 282 Mich App at 390, and the crux of the due-process analysis is on whether the prosecutor's acts or omissions deprived the defendant of a fair trial. *Id.* at 391; see also *Darden v Wainwright*, 477 US 168, 181; 106 S Ct 2464; 91 L Ed 2d 144 (1986).

Defendant first complains that the prosecutor erred by failing to investigate the allegations in this case more thoroughly. In her view, the prosecutor should have forced officers to collect evidence that she feels would have been exculpatory—such as her bank records, video evidence from the places where she met Roberts and Parker, deleted text messages, phone records, and evidence that Roberts was involved with drugs—and should have presented them at trial. She characterizes these shortcomings as violations of the rule stated under *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963).

Under the *Brady* rule, the prosecution has a duty to disclose material exculpatory evidence within its control. *People v Chenault*, 495 Mich 142, 150; 845 NW2d 731 (2014). Defendant has not established that any of the evidence she cites to was under the prosecutor's control or, for

---

[2] Defendant's Standard 4 brief uses the phrase "prosecutorial misconduct." "Although 'prosecutorial misconduct' is a commonly accepted term of art in criminal appeals, it is a misnomer when referring to allegations that do not involve violations of the rules of professional conduct or illegal activity. Less egregious conduct involving inadvertent or technical error is should be deemed 'prosecutorial error.' " *People v Thurmond*, ___ Mich App ___, ___ n 6; ___ NW2d ___ (2023) (Docket No. 361302); slip op at 9 (citations omitted). The phrase "prosecutorial error" is appropriate in this circumstance where defendant does not allege any illegality or violation of the rules of professional conduct.

records that were arguably available to the prosecutor, that the prosecutor failed to disclose the evidence. Indeed, some of the evidence, such as defendant's bank records, were clearly under her control and could have been presented by the defense, had trial counsel wished to do so. The gravamen of her argument is that the prosecutor should have gone to great lengths to investigate and find evidence that supported the defense's theory of the case and then should have presented that evidence at trial. But the prosecution and police officers have no duty to assist the defense in investigating or developing potentially exculpatory evidence, or to preserve evidence over which they have no control. *People v Anstey*, 476 Mich 436, 460-463; 719 NW2d 579 (2006). Defendant has not identified any misconduct involving the prosecutor's handling of evidence.

Defendant next asserts for the first time on appeal that Parker should not have been allowed to testify at trial because he was not really the person with whom she spoke at the liquor store. This Court "will not interfere with the jury's determinations regarding the weight of the evidence and the credibility of the witnesses." *People v Unger*, 278 Mich App 210, 222; 749 NW2d 272 (2008). To the extent defendant asserts Parker was not the person she met at the liquor store, this was a credibility determination for the jury to decide. Moreover, defendant had the opportunity at trial to cross-examine Parker, and therefore, there was nothing plainly erroneous with the prosecution's introduction of this witness.

Defendant also claims that the prosecutor committed error by eliciting perjured testimony from Roberts, Parker, and Elvin. It would be a violation of due process for a prosecutor to knowingly elicit false testimony to obtain a conviction, and the prosecutor has a duty to correct testimony that he or she knows is false when made. See *People v Smith*, 498 Mich 466, 475-476; 870 NW2d 299 (2015); see also *Giglio v United States*, 405 US 150, 153; 92 S Ct 763; 31 L Ed 2d 104 (1972). Defendant has not established that the witnesses' statements were actually false. See *People v Bass*, 317 Mich App 241, 274; 893 NW2d 140 (2016) (stating that it is the defendant's burden to show that the statements were actually false). Defendant primarily relies on minor inconsistencies to establish her claims, but those inconsistencies do not establish that the witnesses perjured themselves. "Although an inconsistent prior statement may be a mechanism to impeach a witness's credibility at trial, it is not definitive evidence that the trial testimony is false." *Id*. at 275. Additionally, the prosecutor had no obligation to correct minor mistakes or inaccuracies in witnesses' statements. See *Smith*, 498 Mich at 475-476. Defendant also asserts that the witnesses' testimonies were clearly false because these testimonies contradicted her testimony. But, the jurors heard all the evidence and, as discussed above, they were instructed to resolve for themselves any conflicts in the evidence. Thus, the prosecutor did not commit error in eliciting testimony from these witnesses.

Defendant claims—without any citation to the law—that the prosecutor should not have called witnesses who had criminal records. A witness's criminal past does not disqualify the witness from testifying. See MRE 601 (establishing that every person is competent to be a witness if he or she has sufficient physical or mental capacity and sense of obligation to testify truthfully and understandably); see also *People v Breck*, 230 Mich App 450, 457-458; 584 NW2d 602 (1998) (noting that a person need only have an understanding of the need to testify truthfully to meet the requirements of this rule). Rather, a person's criminal record may—when appropriate—be admitted as evidence implicating the witness's credibility. See MRE 609. Defendant has not established that the prosecutor engaged in misconduct by calling witnesses whom defendant thinks are unworthy of belief. It was for the jury alone to sift through the testimony and determine who

to believe after subjecting their testimony to cross-examination. See *People v Lemmon*, 456 Mich 625, 646-647; 576 NW2d 129 (1998) (stating that when a matter comes down to diametrically opposed versions of events, it is for the trier of fact to resolve such disputes, not the courts).

Defendant suggests that the prosecutor also manipulated the witnesses' testimonies by coaching them and suggesting answers through leading questions. Specifically, defendant claims that asking Roberts whether the contract was for murder was inappropriate because the prosecutor was putting words in Roberts's mouth. A leading question is a question that suggests the answer that the examiner expects. *People v Hodge*, 141 Mich 312, 314; 104 NW 599 (1905). A question is not, however, leading simply because the examiner includes information on subjects about which the examiner desires testimony. *Id*. Defendant has not identified any question that could fairly be characterized as leading. The prosecutor, for example, asked Roberts what was the "project" that defendant wanted completed, and he responded, "Murder." And when Roberts testified that defendant gave him a first payment for the project, the prosecutor clarified by asking, the "project being?" and Roberts again stated, "Murder." These questions were not leading and a careful review of the record shows that none of the prosecutor's questions to any of the witnesses can fairly be characterized as improper.

Defendant has failed to show that the prosecutor elicited false testimony from any of her witnesses or that she let false testimony go uncorrected. Therefore, defendant has not demonstrated a plain error that warrants relief on this basis. See *Carines*, 460 Mich at 763.

Defendant next complains generally about the prosecutor's closing remarks. Defendant argues that the prosecutor could not offer an opinion about what was going through her mind during the events at issue because there was no way for the prosecutor to read minds. She also argues that the prosecutor could not properly offer an interpretation of the text messages admitted at trial or otherwise offer opinions about the inferences to be drawn from the evidence. These claims are meritless.

The purpose of closing remarks is to allow the lawyers to comment on the evidence and argue their theories of the law to the jury. See *Clark*, 330 Mich App at 433. Courts routinely allow circumstantial evidence to establish a defendant's state of mind during the events. See, e.g., *People v Kenny*, 332 Mich App 394, 403; 956 NW2d 562 (2020). And there was nothing improper about the prosecutor suggesting to the jury the inferences to be drawn from the evidence or otherwise stating her opinion about the evidence; she could even suggest that the evidence tended to show both defendant's state of mind and her motive. See, e.g., *People v Fisher*, 449 Mich 441, 449-451; 537 NW2d 577 (1995) (discussing circumstantial evidence that may properly be admitted to establish motive and state of mind).

Defendant also claims that the prosecutor asserted facts that were false in her closing argument. Although the prosecutor could not argue facts unsupported by the evidence or mischaracterize the evidence, she could argue all the reasonable inferences from evidence admitted at trial. See *People v Watson*, 245 Mich App 572, 588; 629 NW2d 411 (2001). For example, defendant asserts that it was improper for the prosecutor to refer to "death do us part" in her closing when there was no evidence to support that this language was part of her marriage vows. Defendant complains that this assertion was unsupported by the evidence because she composed her own marriage vows. The prosecutor, however, cited to defendant's testimony which

-14-

referenced that phrase, and the prosecutor suggested that created the basis for defendant's motive to hire someone to kill the victim.

The record shows that defendant asserted to the jury that she only made the bad choices disclosed at trial because she was "overwhelmed with grief" at the loss of a "35-year relationship", and her former husband had started dating despite having promised her that that "wasn't going to happen unless one of us had died." Although defendant maintained that she only wanted to scare the victim, the evidence overwhelmingly suggested otherwise, and defendant's testimony that Elvin asserted that he would not date anyone else while either of them was still alive directly supported the prosecutor's argument about the evidence. The same evidence permitted an inference that defendant was not over the end of her relationship with Elvin, even though it had ended years earlier. Therefore, it was not misconduct for the prosecutor to make these arguments. See *Watson*, 245 Mich App at 588.

Defendant also argues that it was improper for the prosecutor to argue that the evidence showed that defendant met up with Parker, a homeless man, to find a hitman. Defendant herself wrote a contract in which she referred to a "hit," and she testified that Parker appeared to be homeless when she spoke with him. Parker testified that defendant stated that she wanted somebody killed when she approached him, and Roberts repeatedly asserted that defendant hired him to kill the victim. From this evidence, the prosecutor could argue that the inference to be drawn from the evidence was that defendant approached a homeless man to find a hitman. There was nothing improper about that argument. See *Watson*, 245 Mich App at 588.

Defendant further maintains that it was improper for the prosecutor to use hyperbole about mafia hits, gangs, and contract killings in her opening statement. The prosecutor did make these references to explain to the jury the typical case involving murder for hire. The prosecutor warned the jury that that was not always the case; she explained that murder for hire could also involve regular, everyday people, such as the instant case. There was nothing improper about warning the jury that this case did not involve typical circumstances that might come to mind when one hears a charge of murder for hire because the evidence that would be adduced would disclose that this was not a case involving the mafia, gangs, or Russian spies, but instead involved fairly ordinary people.

Defendant next states that there was no evidence that she hired someone to kill anyone or even knew about the victim. She also claims that the evidence showed that she did not give Roberts any money—he stole her money. In making these assertions, defendant ignores Roberts's testimony, Parker's testimony, the reasonable inferences to be drawn from her text messages, and the reasonable inferences to be drawn from the agreement she drafted which hired Roberts to perform a "hit." The evidence fully supported the prosecutor's claims that the evidence could best be understood as showing that defendant hired Roberts to murder the victim. The prosecutor did not argue facts that were unsupported by the evidence; rather, the prosecutor argued the reasonable inferences to be drawn from the evidence. See *Watson*, 245 Mich App at 588.

Defendant further contends that the prosecutor erred by bringing the charge in the first place. She claims—without a shred of evidence—that the prosecutor only brought the charge because Elvin was a powerful and influential person and the prosecutor was politically ambitious. If defendant had been from the "hood," she would not have been charged in this case. This, she

-15-

concludes, showed that the prosecutor acted vindictively. In the absence of any evidence supporting her claims, however, there is no basis for concluding that the prosecutor brought the charge at issue under an improper motive. See *People v Ryan*, 451 Mich 30, 35-36; 545 NW2d 612 (1996) (stating that it is the defendant's burden to establish actual vindictiveness).

Finally, defendant contends that the prosecutor deprived her of the presumption of innocence and shifted the burden of proof. More specifically, she states that it was improper for so many police officers to be in the courtroom during trial and that it was improper for the prosecutor to call the jury's attention to defendant's facial expressions at trial. She also claims that it was improper for the prosecutor to tell the jury that defendant did not prove her innocence.

Courtroom procedures—such as the presence of numerous police officers to secure the courtroom—might interfere with the presumption of innocence. See *People v Rose*, 289 Mich App 499, 517-518; 808 NW2d 301 (2010) (discussing courtroom procedures that might implicate the presumption of innocence). Defendant has not, however, established the factual predicate of her claim; she has not identified any evidence that there were an inordinate number of police officers in the courtroom and has not shown that the positioning of the officers implicated the presumption of innocence. Accordingly, she has not established any error that warrants relief. See *id*. at 521.

Similarly, defendant has not identified where in the record the prosecutor brought the jury's attention to her facial expressions and does not discuss the law applicable to that claim of error. As such, she has abandoned this claim of error. See *People v Martin*, 271 Mich App 280, 315; 721 NW2d 815 (2006). She also does not identify the place in the record where the prosecutor purportedly shifted the burden of persuasion. A review of the closing statements shows that the prosecutor merely argued that defendant's version of events was not worthy of belief; she argued that the most logical understanding of the evidence was that defendant in fact hired Roberts to kill the victim. There was nothing improper about those arguments.

## B. POLICE MISCONDUCT

Under a heading of police misconduct, defendant asserts numerous claims of error involving acts and omissions by police officers. Defendant argues that the police officers who investigated this case committed misconduct that deprived her of a fair trial because they failed to investigate and discover the same evidence that she felt the prosecutor had an obligation to investigate and discover. But, again, the police officers owed no duty to investigate and develop evidence for the defense. See *Anstey*, 476 Mich at 460-463.

Defendant also restates her unsupported allegations that her former husband used his power to influence the investigation against her. By failing to offer any evidence or meaningful discussion of the law, she has abandoned that claim of error. See *Martin*, 271 Mich App at 315.

Defendant further contends that a detective perjured himself by representing that defendant continuously texted Roberts from January through March 2020. She notes that Roberts was in jail for a time and could not have texted her during that time. Defendant's complaint is not supported by the record. The texts were admitted into evidence and showed that defendant began texting Roberts late on January 22, 2020, and stopped texting him on March 27, 2020. The texts also

showed that the text exchange paused for a brief period from February 5 through February 27, 2020. There was, therefore, no reasonable dispute over whether she texted him while he was in jail. Moreover, the detective specifically testified about the text messages spanning the period when Roberts was in jail. Therefore, there is no possibility that the jury could have been misled by the detective's testimony into believing that Roberts and defendant were texting when Roberts was in jail. Defendant has not shown that the detective offered inaccurate testimony.

Finally, defendant maintains that the detective should not have been allowed to opine that defendant impeded the investigation. Defendant again does not identify where in the transcript there is evidence that the detective made that statement and, therefore, she has abandoned that claim. See *Martin*, 271 Mich App at 315.

## C. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant also asserts that trial counsel was deficient in various ways. Defendant first maintains that trial counsel should have adjourned the trial so that she would have had time to obtain a handwriting expert who could have attested to the handwriting on a note in defendant's possession. According to defendant, this evidence would have shown that her agreement with Roberts was really about investing money, not soliciting murder.

Although defendant makes much of the importance of this letter, she has not submitted the letter on appeal, and she has not otherwise established that it even existed such that it could have been admitted. Therefore, she has not established the factual predicate for her claim of ineffective assistance of counsel. See *Haynes*, 338 Mich App at 430. Defendant has also not explained why it was impossible for trial counsel to present the note—if it existed—at trial without first obtaining an expert on handwriting. Defendant could have authenticated the letter for admission at trial through her own testimony that she drafted it or, alternatively, that Roberts drafted it and gave it to her. See *People v Smith*, 336 Mich App 79, 106-107; 969 NW2d 548 (2021) (discussing the procedure for authenticating evidence). Defendant also testified at trial that, although she met with Roberts to turn around money, she ultimately hired Roberts to scare the victim. For that reason, it is difficult to see how a letter purporting to establish a different agreement would have benefited the defense. On this record, defendant has not established that trial counsel's approach to this letter fell below an objective standard of reasonableness under prevailing professional norms, and she has not shown that, but for the handling of the letter, the outcome would have been different. See *Haynes*, 338 Mich App at 429-430.

Defendant next argues that trial counsel was ineffective for failing to call character witnesses who would have testified that it was not in defendant's character to hire someone to murder someone else, by failing to call a mental-health expert to testify about defendant's mental health, and by failing to call two witnesses who would have testified that Roberts had been bragging about setting up a white woman. Defendant has not identified any of the witnesses whom she claims trial counsel should have called. She also has not established that these witnesses were ready, willing, and capable of testifying favorably to the defense. Therefore, she has failed to establish any basis for concluding that trial counsel's failure to call these unknown witnesses fell below an objective standard of reasonableness under prevailing professional norms. See *People v Ackerman*, 257 Mich App 434, 455-456; 669 NW2d 818 (2003).

Defendant next complains that trial counsel should have objected to a detective's testimony that the term "38" is often a reference to a .38 caliber handgun. Contrary to this assertion, trial counsel did object to this testimony, and the trial court overruled the objection. There was no error.

Defendant also contends that trial counsel was ineffective for failing to object to all the instances of prosecutorial misconduct. As already discussed, defendant has not identified any actual instances of prosecutorial misconduct. Thus, trial counsel was not ineffective for refusing to make meritless objections. See *Clark*, 330 Mich App at 426.

Defendant next argues that trial counsel was ineffective for failing to object to Parker's being allowed to testify after defendant sent counsel a note in which she stated that she did not recognize Parker as the man with whom she spoke. Whether Parker was qualified to testify did not depend on defendant's recollection of him. See MRE 601. As already discussed, Parker provided sufficient details in his testimony from which the jury could reasonably conclude that he was in fact the person who spoke with defendant at the liquor store. Therefore, he could testify as someone with personal knowledge. See MRE 602. Trial counsel was not ineffective for refusing to make a meritless objection to the prosecutor's decision to call Parker to the stand. See *Clark*, 330 Mich App at 426.

Defendant similarly faults trial counsel for failing to do "something" when defendant sent trial counsel a note in which defendant claimed that two jurors were sleeping. Defendant has not identified any evidence in the record that there were in fact jurors sleeping. Accordingly, she has not established the factual predicate for her claim of ineffective assistance. See *Ackerman*, 257 Mich App at 455-456.

Defendant also argues that trial counsel was ineffective for failing to move to suppress a video, which, in her view, was irrelevant because it did not include a statement that Roberts originally claimed it included. Roberts testified that he made the recording during one of his meetings with defendant concerning the murder-for-hire scheme. According to defendant, the recording did not include comments by defendant that directly confirmed that she hired Roberts to kill the victim. Even so, the video was relevant and admissible to corroborate Roberts's testimony that he met in person with defendant. See MRE 401; MRE 403. Accordingly, any objection premised on the fact that the video was not more incriminating would have been meritless, and trial counsel is not ineffective for failing to make a meritless objection. See *Clark*, 330 Mich App at 426.

Defendant also believes that trial counsel should have moved to suppress the document that included a handwritten address on it that coincided with the victim's old address. She argues that it should have been suppressed because the prosecution's own expert could not confirm that the handwriting belonged to defendant. Contrary to defendant's claim, the prosecution's expert opined that it was "highly probable" that defendant wrote the handwritten portions on that paper. Roberts also testified that defendant gave him that address. Trial counsel cross-examined the expert about the identification and elicited testimony that someone else might have written the address, even though he opined that it was highly probable that defendant wrote it. On this record, there was no plausible basis for moving to preclude the admission of the note. Trial counsel was

not ineffective for choosing to cross-examine the expert about the note rather than making a meritless objection. See *Clark*, 330 Mich App at 426.

Defendant also complains that trial counsel did not perform a proper investigation. Specifically, she argues that trial counsel should have secured Roberts's phone so that she could show that Roberts was involved in other crimes. Defendant speculates that Roberts's phone could have been seized and searched, that it would have contained evidence of other crimes, that the evidence would have been admissible despite the limitations stated under MRE 404(b) and MRE 608, and that no evidence harmful to the defense would have been discovered. Defendant's speculations do not establish the factual predicate for her claim of ineffective assistance of counsel. See *Ackerman*, 257 Mich App at 455-456. On this record, no reasonable defense lawyer would have taken the risks associated with requesting discovery of Roberts's phone in the hope that it would reveal evidence that Roberts was involved in other crimes with which he might be impeached. Defendant has not shown that trial counsel's decision not to conduct discovery of Roberts's phone fell below an objective standard of reasonableness under prevailing professional norms. See *Haynes*, 338 Mich App at 429-430.

Finally, defendant maintains that trial counsel was ineffective for failing to properly prepare her to testify and by failing to request an adjournment so that the defense could hire an investigator to look for exculpatory evidence. Defendant has not explained how trial counsel might have better prepared her to testify and has not stated how the lack of preparation prejudiced her trial. Defendant has similarly failed to identify any exculpatory evidence that would have been discovered by an investigator had trial counsel obtained an adjournment. Again, defendant has failed to establish the factual predicate for her claims of ineffective assistance of counsel. See *Ackerman*, 257 Mich App at 455-456.

## D. JUDICIAL MISCONDUCT

Under the heading of judicial misconduct, defendant complains generally about various acts taken by the trial judge. Defendant first argues that, given the high-profile nature of this case, there must have been extraneous influences on the jury. For that reason, she claims that the trial court should have changed venue, should have sequestered the jury, and should have conducted voir dire differently.

Defendant has not established grounds that would have warranted a change in venue or the need to sequester the jury; she merely speculates that the media coverage warranted a change in venue or sequestration. See *Unger*, 278 Mich App at 254 (describing the kind of showing that would justify a change of venue on the basis of pretrial coverage); *People v Partee*, 130 Mich App 119, 128-129; 342 NW2d 903 (1983) (stating that the defendant bears the burden to show that the jury must be sequestered in order to avoid prejudice). She has also not presented any evidence that the jury was actually exposed to extraneous influence. See *People v Budzyn*, 456 Mich 77, 88-89; 566 NW2d 229 (1997) (stating that it is the defendant's burden to establish that the jury was exposed to extraneous influences). In the absence of such a showing, defendant has not demonstrated the trial court erred by failing to change venue or sequester the jury, or otherwise grant her relief premised on extraneous influences. See *Clark*, 330 Mich App at 415.

In a similar vein, defendant argues that the trial court should have done more to ensure that the prospective jurors were unbiased during voir dire. She does not, however, offer any meaningful analysis of the law applicable to voir dire and the actual proceedings during voir dire, so defendant has abandoned her claim that the trial court should have done a better job during voir dire. See *Martin*, 271 Mich App at 315. She also does not address the fact that the trial court instructed the jury that it should decide the case on the evidence presented at trial alone and not on the basis of sympathy or prejudice. Jurors are presumed to follow their instructions. *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998).

Defendant next argues that the trial court should not have allowed the jury to question her at trial because the jurors' questions were improper. More specifically, she complains that the jurors' questions were "judgmental" in tone. For example, she faults the jury for asking, "As an HR manager with a master's degree in human management, why would you buy alcohol for a person who you thought was homeless?"

The trial court had the authority to allow the jurors to ask questions, but it had the obligation to ensure that the questions were not improper. See MCR 2.513(I). Defendant complains that the questions were judgmental, but it is evident from those questions that the jurors were exploring the credibility of defendant's statements by inquiring into her state of mind when she took specific actions, such as agreeing to purchase alcohol for a man whom she described as homeless. Defendant's credibility was plainly relevant and the proper subject of cross-examination by the jurors through questions posed by the court. See *People v Morton*, 213 Mich App 331, 334-335; 539 NW2d 771 (1995). Defendant has not shown that the trial court mishandled the jurors' questions.

Defendant also makes the meritless argument that the trial court did not properly instruct the jury about reasonable doubt. The trial court instructed the jury that:

> A reasonable doubt is a fair, honest doubt growing out of the evidence or lack of evidence. It is not merely an imaginary or possible doubt, but a doubt based on reason and common sense. A reasonable doubt is just that: A doubt that is reasonable, after careful and considered examination of the facts and circumstances of this case.

The instruction accurately defined reasonable doubt. *People v Hill*, 257 Mich App 126, 152; 667 NW2d 78 (2003). The trial court also properly instructed the jury that it was the prosecutor's burden to prove every element of the crime beyond a reasonable doubt.

Although not clearly stated, defendant appears to spend a considerable portion of her Standard 4 brief complaining that the trial court erred when it denied her motion for a new trial. However, her complaints are limited to the evidence and the trial in general, and defendant does not discuss the law, the trial court's application of the law, or the actual reason the trial court denied her motion. Accordingly, there is no basis for this Court to consider her claim of error on appeal. See *Hanlin v Saugatuck Twp*, 299 Mich App 233, 249; 829 NW2d 335 (2013) ("When an appellant fails to dispute the basis of the trial court's ruling, the Court need not consider granting the appellant the relief it seeks.").

Within this general argument, defendant repeats her assertions that the original judge assigned to the case was biased and should have disqualified himself from presiding over the warrant request. For the reasons already stated, that claim is meritless. See discussion *supra*. She also restates claims that the police officers failed to do their job and generally complains about the fairness and integrity of her trial. Defendant's opinions do not establish errors warranting relief.

Defendant maintains as well that the judge who presided over the trial demonstrated her bias against defendant when she addressed defendant in harsh terms at her sentencing. As this Court has explained, a trial court's harsh condemnation of antisocial behavior at sentencing does not demonstrate bias:

> Sentencing is the time for comments against felonious, antisocial behavior recounted and unraveled before the eyes of the sentencer. At that critical stage of the proceeding when penalty is levied, the law vindicated, and the grievance of society and the victim redressed, the language of punishment need not be tepid. [*People v Antoine*, 194 Mich App 189, 191; 486 NW2d 92 (1992).]

Defendant argues that the trial court erred by refusing to adjourn the case despite trial counsel's lack of preparation. To justify an adjournment, a defendant must show both good cause and diligence. See *People v Coy*, 258 Mich App 1, 18; 669 NW2d 831 (2003). Trial counsel asked for an adjournment because she had two cases coming to trial at about the same time, and she did not feel comfortable preparing for both simultaneously. But when the trial court asked about whether she could be prepared in time, trial counsel responded, "I can certainly have this case prepared if this is the only case that I'm preparing for trial in that timeframe." The trial court then indicated that it could contact the other judge and make arrangements to adjourn the other case. Trial counsel agreed that that would work. The trial court apparently resolved the scheduling conflict and, for that reason, subsequently denied the motion on that basis. Accordingly, there was no basis for an adjournment and the trial court did not err by denying the adjournment. See *id*.

Finally, defendant argues that—notwithstanding her contemporaneous complaint that the trial court erred by failing to adjourn her case—the trial court denied her a speedy trial by not holding trial earlier. Defendant acknowledges that the delay was largely the result of the COVID-19 pandemic, but she argues that the pandemic should not serve as an excuse for purposes of the right to a speedy trial. When evaluating claims that a defendant did not receive a speedy trial, this Court analyzes: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of the right, and (4) the prejudice to defendant. See *Barker v Wingo*, 407 US 514, 530-532; 92 S Ct 2182; 33 L Ed 2d 101 (1972). Because the delay was more than 18 months, there is a presumption of prejudice, which the prosecution must rebut. See *People v Cain*, 238 Mich App 95, 112; 605 NW2d 28 (1999). This Court has already held that the pandemic constituted an excusable delay for purposes of the 180-day rule. See *People v Witkoski*, 341 Mich App 54, 63-64; 988 NW2d 790 (2022). Such a delay should not be held against the prosecutor. See *Cain*, 238 Mich App at 113. Defendant was also out on bond, and there is no evidence in the record that the delay prejudiced her ability to defend. See *id*. at 114. Accordingly, the presumption of prejudice was rebutted and the delay does not warrant relief. See *id*.

## E.  SENTENCING

Defendant further asserts various sentencing errors.  We decline to address those claims except for her arguments involving the proper scoring of the offense variables (OVs).  We address those claims because her claims of error are relevant to resentencing on remand.

Defendant first argues that the trial court erred when it assigned 10 points under OV 14.  That OV addresses whether the defendant was a leader in a multiple offender situation.  See MCL 777.44(1).  Trial counsel argued that the situation did not involve multiple offenders because Roberts never intended to violate the law.  Nevertheless, the trial court found that defendant was a leader in a multiple offender situation and assigned 10 points on that basis.

A murder-for-hire scheme necessarily involves more than one person, and the evidence at trial overwhelmingly showed that defendant paid Roberts to kill the victim.  The fact that Roberts betrayed defendant's confidence and reported her to police does not establish that he was not an offender for purposes of assigning points under MCL 777.44(1).  Additionally, the evidence showed that defendant not only solicited Roberts's help in killing the victim, she directed the timing and location of his actions, and provided an incentive to complete the murder in a timely fashion by setting deadlines with bonuses for earlier completion.  She also tried to cajole him into completing the murder when it appeared that he was balking.  Therefore, we are not left with the definite and firm conviction that the trial court made a mistake when it found that defendant was a leader in a multiple offender situation.  See *People v Isrow*, 339 Mich App 522, 531; 984 NW2d 528 (2021).

Defendant next maintains that the trial court erred when it assigned 10 points under OV 19 on its own initiative.  OV 19 addresses interference with the administration of justice.  See MCL 777.49.  A trial court properly assigns 10 points under that variable when the offender "otherwise interfered with or attempted to interfere with the administration of justice."  MCL 777.49(c).  In assigning 10 points, the trial court relied on the evidence that defendant failed to disclose the phone that contained the text messages at issue and then misled officers about the last time she had used the phone when asked.

This Court has held that the phrase "interfere with the administration of justice" means to hamper, hinder, or obstruct the administration of justice.  See *People v Hershey*, 303 Mich App 330, 343; 844 NW2d 127 (2013).  Giving a police officer false information or deceiving officers during an investigation constitutes interference or attempted interference in the administration of justice.  *Id*. at 344.

At trial, a detective testified that he was present for the search of defendant's home.  He stated that he told defendant that they were searching for all cell phones and electronic devices.  He asked defendant for her cell phone, and defendant directed him to her iPhone.  She did not disclose that she had another phone.  After the detective found the other phone in defendant's closet, he asked her if it was still in use, and defendant responded that she had not used it in about five months.  The evidence at trial showed that defendant had been using the phone up until the search.

On appeal, defendant maintains that the detective misunderstood her statement, which she made under stress. Nevertheless, the trial court could find, on the basis of the detective's testimony, that defendant deliberately concealed the fact that she had a second cell phone and then lied about her usage in an attempt to interfere with the police investigation. Given this testimony, the trial court did not clearly err when it found that defendant attempted to interfere with the administration of justice. See *Isrow*, 339 Mich App at 531.

Finally, defendant states that the trial court should not have assigned 50 points under OV 6, because there was no evidence that she had the premeditated intent to kill. OV 6 requires the trial court to assign 50 points if the offender had the "premeditated intent to kill." MCL 777.36(1)(a). The overwhelming evidence demonstrated that defendant hired Roberts to kill the victim, and that supported a finding that defendant had the requisite intent. The trial court did not clearly err when it found that defendant had the premeditated intent to kill. See *Isrow*, 339 Mich App at 531.

Affirmed.

/s/ Michael J. Kelly
/s/ Jane E. Markey
/s/ Thomas C. Cameron